96 F.3d 1451
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Milo D. BURROUGHS, Petitioner-Appellant,
v.
UNITED STATES DEPARTMENT OF the ARMY; Togo West, Jr.,
Secretary of the Army, Respondents-Appellees.
 No. 95-35737.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 7, 1996.
Decided Aug. 29, 1996.
 
 Before: ALARCON, NORRIS and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Milo D. Burroughs appeals from the order affirming the decision of the Merit Systems Protection Board (the "Board") to uphold the Department of the Army's ("Army") termination of Burroughs from his position as a civilian test pilot. Burroughs was removed from his position after he disobeyed an Army order to undergo a medical examination to verify his flying fitness. Burroughs argues that reversal is mandated because: (1) the Board erred in determining that the order mandating the medical examination was valid; (2) the Board erred by holding that he had to obey the order before he could contest its validity; and (3) he received inadequate notice of the reasons for his termination.
 
 
 3
 We affirm the district court's order upholding the Board's decision because we conclude that the Army's order was valid and Burroughs received adequate notice of the reasons for his termination.
 
 I.
 
 4
 An appeal from a decision of the Board is ordinarily filed in the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). If, however, "the action is a 'mixed case' involving a claim under Title VII, the case is filed in the district court and the district court has jurisdiction to hear the entire claim." Morales v. Merit System Protection Board, 932 F.2d 800, 801-02 (9th Cir.1991).[1] The district court's final judgment disposed of all of Burroughs' claims against the Army and Burroughs timely appealed. We have jurisdiction under 28 U.S.C. § 1291 to review the final decision of the district court.
 
 II.
 
 5
 Burroughs was employed for 13 years as a civilian maintenance test pilot for the Army in Fort Lewis, Washington. This position required Burroughs to inspect and fly repaired aircraft to determine if the craft were airworthy.
 
 
 6
 The medical standards for Burroughs' position as a civilian test pilot were established by the Office of Personnel Management ("OPM"). 5 C.F.R. § 339.202. The relevant medical standard for Burroughs' position is set forth in OPM Qualification Standard X-118 which provides:
 
 
 7
 At the time of initial appointment, candidates for all pilot positions must possess a current, (i.e., first or second class) medical certificate in accordance with FAA [Federal Aviation Administration] regulations; both meet the intent of the requirement. If an agency decides, for example, not to accept the second class medical certificate, the rationale for the decision should be based upon the requirements of the position and should be thoroughly described in agency operating material....
 
 
 8
 OPM Qualification Standard X-118.
 
 
 9
 The current dispute was triggered in August 1992 when Fort Lewis received the results of an inspection of its aviation facilities by Forces Command. The inspection report noted that Burroughs' flying fitness was verified only by an FAA medical certificate. The inspection report stated that Burroughs must also satisfy Army medical standards as set forth in Army Regulation ("AR") 40-501 and undergo an Army Class II Flying Duty Medical Examination (an "Army medical examination").
 
 
 10
 In January or February 1993, Burroughs presented Major John Charette, the Fort Lewis Army flight surgeon, with a copy of his FAA medical certificate and asked to be issued a DA Form 4186 or an "up slip." An "up slip" is the flight surgeon's recommendation to continue a pilot's flying status. After conferring with the Army liaison office, Major Charette declined and told Edward Emilia, Burroughs' supervisor, that Burroughs was required to undergo an Army medical examination to verify his flying fitness.
 
 
 11
 On May 7, 1993, Emilia sent Burroughs an "Order to Report for Medical Examination." The order explained that Burroughs' position as a civilian test pilot required Burroughs to satisfy the "physical requirements" set forth in AR 40-501 and annually pass an Army medical examination. The order directed Burroughs "to report to Aviation Medicine." The order advised Burroughs that if he failed to report for the exam, he "may be removed from [his] position." Burroughs disobeyed this order, asserting in a May 12, 1993 letter that the Army had "neither the requirement or the authority to order [him] to take an Army Flight Physical."
 
 
 12
 On May 17, 1993, Emilia sent Burroughs a second "Order to Report for Medical Examination." The second order omitted the reference to the physical requirements in AR 40-501, and stated only that Burroughs was "directed to report to Aviation Medicine" in order to "be examined by an Army flight surgeon." Burroughs also disobeyed the second order. On June 26, 1993, Burroughs was once again ordered to report for a medical examination. Like the second order, the third order requested only that Burroughs report for a medical examination. Burroughs disobeyed the third order as well.
 
 
 13
 Burroughs was disciplined each time he refused to obey the orders. After his first refusal, Burroughs received a notice of reprimand. After his second refusal, Burroughs was given a one day suspension. On July 16, 1993, after disobeying the order for the third time, Burroughs was sent a "Notice of Proposed Removal." This notice explained that Burroughs was being removed based on his failure to report to Aviation Medicine on June 28, 1993 for an Army medical examination. Burroughs was removed from his position effective August 27, 1993.
 
 
 14
 On September 16, 1993, Burroughs appealed his termination to the Board. After a hearing, the Board entered a final decision affirming the Army's termination of Burroughs. Although the Board determined that the Army could not order Burroughs to satisfy the Army's physical requirements set forth in AR 40-501, the Board held that the Army could order Burroughs to take an Army medical examination in order to verify that Burroughs satisfied the FAA medical standards.
 
 
 15
 In determining that the Army could validly order a medical examination for a civilian pilot, the Board relied on a document entitled, "Summary of Meeting between Staffs of the Office of Personnel Management and the Office of the Surgeon General Regarding the Medical Qualification Standard for the Aircraft Operation Series" (the "OPM summary"). The OPM summary documents a meeting between the OPM and the Army in which the Army expressed a concern that "private sector physicians" were not in the best position to judge whether a pilot was fit to fly military aircraft. To alleviate this concern, the OPM agreed that the Army did not have to accept a FAA medical certificate and could elect to examine civilian pilots "using the medical standards established by FAA for the requisite medical certificate." The Board concluded that the OPM summary provided the Army with the authority to order Burroughs to take a medical examination.
 
 
 16
 Additionally, in response to Burroughs' argument that the Army's initial order was invalid because it indicated that he would be measured against the Army standards, the Board stated that it "may well be that MAJ Charette would have gone on to measure the results of the examination against the [Army] standard, rather than the FAA class 2 standard." The Board explained, however, that the issue of whether the Army would have used the correct standard to measure Burroughs' fitness never arose "because the appellant refused to take the examinations."
 
 
 17
 Burroughs filed an appeal in district court from the Board's decision. The district court referred the case to a magistrate judge who recommended that the Board's decision be affirmed. On March 30, 1995, the district court adopted the magistrate's recommendation and issued a final judgment affirming the Board's decision. Burroughs timely appeals.
 
 III.
 
 18
 We review the Board's decision to determine if it is "arbitrary, capricious, or an abuse of discretion; procedurally defective; or unsupported by substantial evidence." D.E. v. Dept. of the Navy, 721 F.2d 1165, 1166 (9th Cir.), amended, 722 F.2d 455 (1983). In addition, we "must give substantial deference to an agency's interpretation of its own regulations." Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 216 (9th Cir.1995) (internal cite and quotation marks omitted). Unless the regulation's plain language compels an alternative reading, we defer to the agency. Id.
 
 IV.
 
 19
 Burroughs argues that reversal is mandated because the Army's order was invalid. Burroughs concedes that the OPM expressly approved the Army's decision to order medical examinations. Burroughs argues, however, that the OPM's approval did not confer authority on the Army because the regulations promulgated by the OPM do not authorize the Army to order civilian pilots to submit to Army medical examinations. Burroughs thus asserts that the OPM could not have authorized the Army to order a medical examination unless it formally amended its X-118 medical standard.
 
 
 20
 The regulations provide that the "OPM may establish or approve medical standards for a Governmentwide occupation." 5 C.F.R. § 339.202. The "[s]tandards established by OPM ... must be: (a) Established by written directive and uniformly applied, (b) Directly related to the actual requirements of the position, and (c) Consistent with OPM instructions published in FPM chapter 339." Id. A "medical standard" is "a written description of the medical requirements for a particular occupation based on a determination that a certain level of fitness or health status is required for successful performance." 5 C.F.R. § 339.104 (emphasis omitted and added). An agency may request the OPM to "amend a standard" by making a request in accord with Chapter 399-8 of the Federal Personnel Manual.
 
 
 21
 The Army does not dispute that the OPM may not amend the X-118 standard without complying with its regulations. Instead, the Army asserts that the OPM's agreement to allow the Army to order medical examinations does not amend the substance of the X-118 standard. After reviewing the X-118 standard and the regulations, we agree. As the OPM made clear in its OPM summary, the fact that the Army may order an Army medical examination does not change the underlying medical standards applicable to civilian pilots. In the OPM summary, the OPM adopts the Army's proposal that, "in lieu of accepting the FAA medical certificate as presumptive evidence of an individual's medical qualification, [the Army could] examine and evaluate individuals for ... medical fitness, using the medical standards established by the FAA for the requisite certificate." Thus, the OPM only authorized an alternative procedure (i.e., a medical examination with an Army physician as opposed to a private sector physician) by which the Army could verify the FAA medical standard. In fact, in the OPM summary, the OPM specifically refers to its agreement with the Army as a "modified interpretation " (emphasis added) of the X-118 standard, not as a modification of the substance of the standard.
 
 
 22
 Burroughs argues that the OPM's agreement changed the medical standard for civilian pilots because the X-118 standard merely requires "possession" of an FAA medical certificate. Burroughs argues that the X-118 standard therefore governs both the underlying FAA medical standards and the procedures for verifying that the standards are satisfied. Burroughs contends that, by allowing the Army to verify independently the FAA medical standard, the OPM effectively created a new X-118 standard without complying with the procedures in its guidelines.
 
 
 23
 While Burroughs' interpretation of the X-118 standard and the regulations is certainly plausible, this interpretation was rejected by the OPM. In the OPM summary, the OPM interpreted the X-118 standard to allow for the Army to verify independently that a pilot meets the FAA standard. The OPM's interpretation of the X-118 standard is also plausible. It may rationally be inferred that the medical standard for Burroughs' position is the possession of a substantive level of fitness sufficient to merit an FAA certificate and not the bare possession of the certificate. The OPM's interpretation is consistent with the more general OPM regulations governing an agency's right to authorize a medical examination. In relevant part, the regulations state:
 
 
 24
 [A]n agency may require an individual who has applied for or occupies a position which has medical standards or physical requirements ... to report for a medical examination ...
 
 
 25
 (2) On a regularly recurring, periodic basis after appointment; or
 
 
 26
 (3) Whenever there is a direct question about an employee's continued capacity to meet the physical or medical requirements of a position.
 
 
 27
 5 C.F.R. § 339.301(b) (emphasis added). Thus the OPM regulations specifically provide for an agency to order a medical examination even though the OPM has established a "medical standard" for the position. This suggests that the OPM medical standards do not subsume the procedures by which an agency may verify that an applicable standard has been satisfied.
 
 
 28
 In sum, the X-118 standard and OPM regulations can be rationally interpreted to allow the Army to order civilian pilots to take an Army medical examination. Indeed, the OPM expressly adopted this interpretation. The OPM's interpretation of its own regulations is entitled to substantial deference. Providence Hosp., 52 F.3d at 216. Accordingly, we hold that the Board's decision to uphold the validity of the Army's order directing Burroughs to report to Aviation Medicine is rational and is not arbitrary or capricious. Because we uphold the Board's finding that the Army's order was valid, we do not reach the question of whether Burroughs' failure to obey the order precludes him from contesting it.
 
 V.
 
 29
 Burroughs also argues that reversal is mandated because the Army did not give him sufficient notice of the reasons for his termination. We disagree.
 
 
 30
 Before an agency may terminate an employee, it must give the employee advanced written notice "stating the specific reasons for the proposed action." 5 U.S.C. § 7513(b)(1). The notice must be sufficient to place the employee on notice of "the claims with which he is being charged so that he may adequately prepare and present a defense before the agency." Brown v. U.S. Postal Service, 47 M.S.P.R. 50, 57 (1991).
 
 
 31
 Burroughs argues that "he was given no advance notice that he was being fired for failure to report ... for an FAA Physical." Burroughs appears to be contending that because the initial order arguably required him to satisfy Army medical standards as opposed to FAA medical standards, he was denied notice of the specific reasons for his termination. Burroughs' argument misstates the reason for his removal. As the Board noted, Burroughs was not terminated because he failed to comply with FAA or Army medical standards. Instead, Burroughs was terminated because he failed to comply with an order to report for a medical examination. As is set forth in detail in the factual section above, Burroughs was given clear notice that his proposed termination was based on his failure to obey Emilia's order to report for a physical examination. Burroughs was not deprived of his right to procedural due process.
 
 
 32
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Burroughs' action was originally accompanied by a claim under the Age Discrimination in Employment Act ("ADEA"). After the parties submitted the ADEA claim for trial on a stipulated record, the district court ruled in favor of the Army. Burroughs has not appealed from the district court's ruling on his ADEA claim